Good morning. I'm Vicki Buchanan. I'm the attorney on behalf of Paul Richards. I'm going to be taking the first arguments related to the prosecutorial misconduct. How many minutes each? Seven minutes for me, five minutes for Catherine Young, and five minutes for Gerald Braynon. Seven, five, and five. Could the Court do that, please? I'm going to be arguing the prosecutorial misconduct, possible conflict of interest, the denial of the defense, and the honest services fraud issues. This was a case that was promoted by Robert Cudler after Paul Richards denied him the opportunity to place billboards in Linwood. It was bolstered by the testimony of his nephew, Julio Knowles, who was dismissed because he had accepted kickbacks. And finally, it was prosecuted by Daniel Shulman, who had a very strong connection with Robert Cudler and Robert Cudler's firm. The case was dismissed because it refused to allow any information on any of these men's actions or motivations or what they had. What does it matter that the prosecutor used to work for the law firm that also represented this person who complained about the corruption? Well, it matters because the person who complained allegedly brought his personal vendetta against Mr. Richards to Mr. Shulman. He went directly to Mr. Shulman. He also said throughout the Court – and this is – we're talking about an evidentiary hearing. The issue with – as far as the prosecution is concerned is maybe it didn't make any difference in the scheme of things later on. However, it did make a difference that there was grounds enough to investigate what really was the relationship with Cudler. In fact, Cudler would go out and brag. The charge is conflict of interest, not merely prior knowledge. Yes. It's conflict of interest. Suppose a prosecutor has prior knowledge of wrongdoing before he becomes a prosecutor. As I understand it, that does not disqualify him from prosecuting the case. Is that correct? That's correct. But we don't know exactly when the knowledge – Now, conflict of interest implies some sort of interest. For example, if it's, say, a small firm and they're paying a large pension or something to a prosecutor or some sort of severance pay, then it might be affected by maintaining a relationship with the client of the firm. But I don't understand anything like that to be the case here. Well, Mr. Cudler was the client of the firm of Gibson, Dunn & Crutcher. Mr. Cudler's personal lawyer was Wayne Smith. What I asked that question about was I couldn't imagine that anything Cudler pays Gibson Dunn would affect how much money the prosecutor makes. It doesn't make any difference about what the prosecutor makes, but he might be inclined to pursue charges because he has a relationship and his firm had a relationship with Mr. Cudler. He knows that. You're talking about the appearance issue, right? Yes. You're saying that he doesn't, you're not alleging that Shulman had a financial interest in something that Cudler was doing with Gibson Dunn, is that correct? You're just saying there's an appearance of impropriety there. Correct. And the district court, I guess, held no, and we're looking at it for an abuse of discretion. Well, he didn't rule no. He just said, well, I don't want to have an evidentiary hearing on it. I don't see anything at this time to indicate that any connection between the AUSA and Gibson and then even further Gibson representing Bulbord, there's no indication this AUSA was on that at all. Well, he's relying on Mr. Shulman's self-serving declaration. What did you have to contradict that? We don't, well, we had to contradict it that Mr. Shulman is listed as a lobbyist for Bulletin Displays, which is Mr. Cudler's business. He worked directly with Wayne Smith, who was Mr. Cudler's personal attorney. Mr. Cudler bragged that he had a, he had a special relationship with the prosecutor in this case. Well, that was a report from his rival, David Smith. Is that correct? Correct. So that was a report from the Regency's lobbyist, David Smith. But you didn't have anything? No. We had as much evidence as we could gather without an evidentiary hearing. And that was the whole point of the evidentiary hearing. Was it? There was a declaration on file from Mr. Shulman? Yes. Was it under penalty of perjury or something to that degree? Yes, it was. Would you have had the opportunity to cross-examine him on his declaration? If there had been an evidentiary hearing, I believe. Did you ask to cross-examine the declarant? Not other than an evidentiary hearing. If I understand your case right, it means that a prosecutor cannot prosecute a case in which a client of a law firm that the prosecutor used to work for has some interest. Is that correct? No. That's way too broad. Because we're talking about big law firms here. And we're talking about cases, one case, I can't remember the name of it, where it's a bankruptcy. The bigger the law firm, the weaker the claim of conflict, I would think. Yes, indeed. But in this case, it's not like Mr. Shulman worked in Century City in the case, and the Cutler's claim was down here in Newport Beach. This case was Mr. Shulman was working directly for the Mr. Cutler's personal attorney. He is listed as a lobbyist for Mr. Cutler's company. So it's not just he happens to be an attorney at Gibson, Dunn & Crutcher. He happens to have a substantial relationship and apparently enough of a relationship that Mr. Cutler was able to say no. You're saying what makes this special is he worked for the attorney who represented the complaining witness. Yes. That is part of it. Now, I don't know that that's the end-all and be-all of this case, but it certainly is something that the defendants should have been entitled to have an evidentiary hearing to find out about. Now, is there a case that – let me explain why I'm puzzled. When I was in private practice, people used to pay me good money by the hour to represent them. So I was biased in their favor. I tried to make whatever arguments I could on their behalf. Once they weren't paying me anymore, and it had been a couple of years since they had, why should I be on their side? They're not my client anymore. Judges are allowed to sit on cases where former clients are parties. Most judges, if it was an intimate relationship, won't, but they're allowed to. And most judges, if it was not an intimate relationship, do, perhaps after some interval. And I'm trying to think why a prosecutor would be subject to a stricter rule. Well, it's the appearance of impropriety, and it's also the fact that the prosecutor – Why does it appear improper to a reasonable person? He's not getting paid to be an associate to represent his boss's client anymore. Well, he may want to go back into private practice after he's no longer – So what? – an attorney, and he doesn't want to burn any bridges at his former firm. But beyond that, he represents – he is the people's attorney. He is the United States of America. That's who he represents. And he should be beyond the appearance of impropriety when he's a prosecutor. And all we were saying – Is there a case that stands for this? It really is a stricter rule than applies to judges. Well, there's just the general – the general ethical requirements of prosecutors. The problem you're up against, of course, is the standard of review. I mean, this is a good argument for the trial court. But our task, if I'm correct, is that we review the trial court's determination for an abuse of discretion. In terms of the evidentiary hearing. Right. Correct. The reason I asked you that earlier, because I had numbers of cases where an affiant or a declarant would put something in, and you'd say, I want to cross-examine the declarant or the affiant. It's a little bit different than a broad-open evidentiary hearing. Well, yeah. And this is just simply – I think there's a cumulative play between what happened in this case in terms of Mr. Cudler and then the prosecutor pursuing it and the statements being said that he has a special relationship. I think there may be – I don't know if it all goes to kind of the trial court's general abuse of discretion in several issues, including not allowing anything to do with what Mr. Cudler's involvement was in this particular case. Plus, what the court said was somewhat provisional. He said, everything is open for revision. I don't see anything at this time. So I assume nothing else came up except what you had at the beginning. No. But there was a – the – in the – I mean, the defense in this case came up with a lot of information. They found a lot of information in terms of the relationships with the various firm, with Gibson, Dun & Crutcher, the lobbying papers. During the trial. The statements. Yes, during the trial. Did they renew the motion? No, that was – I mean, I'm sorry, with the initial – with the initial motion that was made prior to trial. Thank you. Thank you, counsel. Okay. So the other question is – Counsel, counsel, you're – you've exhausted your time. Oh, okay. I was going to talk about the case. You're a minute and a half over. Oh, okay. I got it. Thank you. Two minutes over. Counsel. Good morning, Your Honors. Katherine Young from the Federal Public Defender's Office for Appellant Paula Harris. I'm dealing with, first of all, the issue of the trial court's refusal to allow the defense to controvert the testimony of Julio Knowles regarding kickbacks. And I want to, first of all, discuss briefly why this was so important to Ms. Harris. Ms. Harris was not involved in politics, nor was she an attorney. She was at the Bank of America where she had been employed since she graduated from high school. She only became involved to help out her nephew. She never participated in the negotiations for the contract, and she basically took a role in the banking. The government tried to use Julio Knowles to prove that Ms. Harris knew that Mr. Richard's involvement in the contract was improper, and they did that by eliciting a detailed explanation from Mr. Knowles as to why he left AGS. The government asked Mr. Knowles, why did you leave AGS, and Mr. Knowles testified, I came to get my paycheck from Ms. Harris. She told me Mr. Richard had the checkbook. I became so incensed. This was the last straw. Mr. Richard's involvement was so improper that I called a family meeting. And at that point Ms. Harris was not involved. Ms. Harris was not involved. Mr. Knowles testified that Mr. Richard's had been in control of AGS all along, even before this testimony, this particular testimony. Well, I think this testimony was pivotal to whether Ms. Harris knew or had been informed that there was an alleged impropriety with respect to Mr. Richard's control. And Mr. Knowles specifically testified that he told Ms. Harris this was improper, and Ms. Harris said at the meeting, you know, Mr. Richard's is my second half. I can't deal with this. And when asked what do you mean by Mr. Richard's is your second half, Mr. Knowles testified that Ms. Harris said, well, I depend on him for financial support. So Mr. Knowles was allowed to testify that Ms. Harris allegedly knew that there was an impropriety in Mr. Richard's involvement in AGS, and that because she was so dependent upon him for financial support, she could do or would do nothing about it. Now, in fact, all that was completely false. What happened was that Mr. Knowles was discovered demanding kickbacks from the contractors, and the family called the meeting and terminated Mr. Knowles because his demand for kickbacks was so improper. Now, the defense was not allowed to introduce any of that evidence contrary to the specific testimony of Mr. Knowles, because the Court said it was inadmissible under Rule 608B. But 608B, as the government's own authorities tell us, does not apply to impeachment by contradiction. It applies to specific instances of the conduct of the witness for the purpose of attacking or supporting the witness's character for truthfulness. It's inadmissible. It does not apply, as all the government's authorities tell us, to impeachment by contradiction, which is what the defense wanted to do in this case. The Court seems to have decided that this was simply too tangential to have all that much relevance. That's another issue I wanted to address, Your Honor. Rule 607 says that the credibility of a witness may be attacked, and that the government's authorities also tell us. This is something the government elicited a detailed explanation of. The government asked Mr. Knowles all these questions about improprieties and about what he had told Ms. Harris. At that point, even if it had been tangential before, it certainly became relevant when the government introduced this evidence and went through a detailed recitation of what happened at the meeting, who was present, what was said, everything that Ms. Harris was allegedly told by Mr. Knowles about alleged improprieties. And so at that point, it became not tangential, but directly relevant, because it was direct evidence against Ms. Harris that she was not allowed to contravert. It's not the improprieties that the impeachment testimony would have gone into. It was the reason that Knowles stated was his reason for leaving. So if that had been important, what the reason was that he left AGS, then I can see rebuttal testimony saying, no, it was a different reason you were caught in these scams. But if the testimony on direct was, I told her about improprieties, et cetera, then the information about the kickbacks was not really directly on point, was not contradicting. Well, I see your point, Your Honor, and the reason that it was directly contradicting was because none of it happened. I mean, the testimony would have shown that Mr. Knowles never went into a rage because Mr. Richards had the checkbook or complained about alleged improprieties. You lost me. How does it show that none of it happened? Because the reason the meeting was called was because they discovered kickbacks, not because there was a problem with the checkbook and Mr. Knowles called the meeting to complain about the improprieties. The meeting was instead called by Harris and Richards to complain about Knowles' misconduct. He fabricated the whole story in an attempt to explain why he left AGS. But since my time is, in fact, very short, let me go on to the jury misconduct that we also talked about. And since I have so little time, I want to focus on Juror Gates. In that case, Juror Gates was someone who, Sister Veronica, worked with one of the defendants on one of the contracts at issue in the litigation, and he didn't disclose it until after trial. There was, in fact, he knew from the first day that his sister worked at the same city that was the subject of the litigation. He didn't disclose it. What does it matter? I'm sorry? What does it matter? It's a clear – it's a ground for excusal for cause. If a juror has a family member who's involved in the very subject of the criminal case. The word involved is a very broad word. That's why I asked why it matters. Well, she said that she knew the defendant well and that she worked with him on the very contract that was at issue in the litigation. And when a juror – and there was evidence that they talked repeatedly throughout the course of the trial. So, clearly, he was subject to and privy to insider information that, as a juror, he should not have had. Did he lie during voir dire about this? He seemed to have realized this later on. Well, I think that he was a master of misdirection. And what he said was, well, she knew – she didn't know Mr. Richards that well. And she didn't know Ms. Beale that well. When, in fact, what he didn't say was, but she knew Mr. Thomas, the defendant sitting there, very well and, in fact, worked with him. And by saying that she didn't know Ms. Beale that well, Ms. – Well, was she asked that? No. She wasn't asked that, Your Honor. But I think the implication was he said she didn't know Ms. Beale that well. Now, Ms. Beale was the one who was responsible for supervising Mr. Thomas. So by saying she didn't know Ms. Beale well, the implication was, well, then she didn't know Mr. Thomas and didn't work with him because Ms. Beale was the one who supervised Mr. Thomas. So she should have volunteered something to a question that she wasn't asked. Well, I think that when you read – That's a returnable question. There was no question, did you know Mr. Thomas? That's correct, Your Honor. But I think when you read his voir dire during the – in the midst of deliberations, he was really not responding to questions, and he was kind of misdirecting the Court's inquiry. But one point I just wanted to make very briefly is that the cases tell us that when you're investigating a sitting juror, it's really not the lawyer's responsibility to do the hard questioning, because that juror may stay on the case and they don't want to prejudice the jury against them. It was the judge's responsibility to ferret out the truth in this case. Thank you, counsel. Thank you, Your Honor. Good morning. Gerald Brannon on behalf of Mr. Thomas, and I'm going to address – I'd like to address this morning the loss issue. The defendants believe that there was – we believe there was procedural error in the Court's calculation of loss. This case had an admittedly complex loss calculation.  Criminals typically don't keep good books of the exact extent of their wrongdoing, and in a complex scheme, it's very hard to determine exactly what the extent of wrongdoing is. So we have a rule that cuts quite a lot of slack for the district court in making the calculation. In this case, I don't know if the calculation was right, but I don't know that it's wrong. Well, I think the Court didn't really conduct the proper calculation, didn't explain its calculation in a complex loss case. This was not a Ponzi scheme or a straight theft where we could just say that we'll take the gross – No, it's harder. Yeah, much more difficult. It had to do with service contracts that were subject – It seems the key issue was whether the intended loss exceeded 2.5 million. Is that the break point on the 18 level enhancement? Yes, 2.5 million. And the Court said, well, there's a whole lot of questions about exactly how much it was in terms of 6 million, but there's no question that it was 2.5, and it seems to me that it used Harris' and Thomas' lawsuits, both of which were in excess of 2.5. Am I wrong to look at it that way? Well, yes, I think you are. And the reason is because civil damage claims are grossly exaggerated. It's not our fault. I mean, that's what he said. So you're saying he lied in his lawsuit. But it's not an economically reasonable figure to base a loss calculation on. Rule 11 says you've got to be careful about what you file, but we're not allowed to rely on what you file. I mean, he said – I mean, that was the point. It's greater than 2.5, both of them, Harris and Thomas. And it seems to me that that might be enough to support the idea that it was over 2.5. It's very, very speculative. You have a loss claim that you make. Nobody can subjectively – Wait a minute. I'm confused by what you just said. I agree with the general principle you stated, that ordinarily the ad dominum in a complaint is not very probative of what the damages will turn out to be. However, here the ad dominum is stated by the defendants, who are now saying basically I lied in my complaint. Have I got that right? Yeah, but we're talking about what loss each individual defendant should be held responsible for. And this is a subjective standard. I mean, the guidelines give a lot of guidance. Look, I'd have no trouble with it if, oh, it was an ad dominum in a personal injury claim and the plaintiff said it caused me a million dollars in damages. And it's the defendant who's facing the restitution obligation and says that million-dollar claim was just a lot of hot air. The damages were at most $20,000. But here it's the plaintiff in the civil case says the damages are $6 million and the same person is the defendant in the criminal case. And he says, no, they weren't. Have I got the structure of it right? Well, they're two different animals, the civil claim and the criminal case. Oh, I know they're two different cases. So, I mean, you give your civil case to a lawyer. He jacks up the claim because he wants to settle the case. They may not get any award. So I think your answer is, yes, that is the structure. But don't hold what he said in the civil case against him in the criminal case. Well, yeah, it's a different animal because in determining loss, and in this case a loss that wagged the tail of the dog of the sentence, yes, you have to consider what each individual defendant subjectively intended. And throughout two of them. Let me ask you this, though. Did the damages claimed in their civil action not reflect the contracts that they had, the amounts that were available under the contracts? Was the damage claim not reflective of the contracts? They did reflect that, yes. Because then for the contract amount was the amount they were claiming, I guess, or the amount they intended. But there was no guarantee they would get anything. I mean, the city could have defended the case. What's the difference between that and me telling some friend, gosh, I was trying to get away with $4 million, but I didn't make it? And then so they bring the friend in. The friend said he told me he was trying to get away with $4 million, but he didn't make it. Well, could any of these defendants actually subjectively believe that they were going to get that? Let's just take, for example, what happened in Thomas' case. The city said, okay, we're going to pay you $1.4 million. That's way below the $2.634 million that the PSR alleges was the claim in his lawsuits. So he didn't come anywhere near that. Had he gotten that, and that was the loss figure, he would be two points lower at level 16. So that alone, even if you added in the nuisance abatement contract, the $550,000. So this means that if we had an insurance fraud case, suppose somebody's buying, he buys a house and he burns down his own house. It's an insurance fraud case. He sued the insurance company for bad faith and said, my loss on my house is $1 million. They counterclaimed on the ground that he burned down his own house so the policy didn't apply and they won in the civil case. Or they didn't win and the civil case was never resolved, whatever. But he claimed $1 million in the civil case. Subsequently, he gets convicted of insurance fraud in criminal court and he says that $1 million claim should not be held against me. You can't hold me guilty, responsible for trying to get $1 million. I'm here again. I think there's a fundamental difference. In the criminal case, we talk about a person's liberty. Wait a minute. I think you're answering a subsequent question. I think you're giving a yes, but answer. Have I got that right? Yes. Yes, but. Yeah. Okay. I understand your argument, but I just wanted to make sure I understood your argument correctly as to each step. And then the court says. I mean, I understand the but, but I wanted to make sure I got the yes. So the court took three defendants who were wildly divergent in terms of their sentencing postures and sentenced them in exactly the same manner. Said exactly the same thing. Didn't invoke the clear and convincing evidence term of art. And in sentencing Richards, the court even said there were no actual damages. There were substantial damages. We don't know what that means. We're left in the dark. We're trying to figure out how the court extrapolated from a $7 million potential loss, as described by the PSR, to get to 2.5. We have no road map for that whatsoever. Thank you, counsel. Good morning, Your Honors. Assistant United States Attorney Bruce Searby for the United States. I'd like to start with the nulls kickback issue. And I'd like to say, of course, at this point it's clear that there's no relevance to the excluded testimony to the elements of the offense. And what we're talking really about is does this fit within the doctrine of impeachment by contradiction, which is not barred by Rule 608B. The record shows that at trial no testimony was proffered to contradict specific testimony by nulls on direct. Contradiction by impeachment or impeachment by contradiction in the Ninth Circuit is not as expansive a concept as defendants would wish. It means, as in the Antonia K.S. case, on direct testimony you have a witness who says X, and on rebuttal and impeachment by contradiction you can introduce someone to say negative X, to flatly contradict that. Did the district judge just go on admissibility or did he also go on the time it would take as a matter of discretion exceeds the probative value of the judgment? Yes, Your Honor. That's an entirely separate basis other than 608B that was offered by the district judge to exclude all this testimony, and it is never addressed by defendants on appeal. And they never get to how tangential this testimony was as a separate and independent ground for its exclusion by the district court. So that's a very important point I was going to get to. You also hear here on appeal, again, over and over they say that there was their defense that nulls was fired from AGS. Well, the court will find no evidence in the record as to nulls having been fired by AGS. That's a linchpin to this very attenuated theory of relevance that they attempt to give for impeachment by contradiction. And certainly these three witnesses, Adriana Richards, Saul Preciado, and Paul Richards, their proffered testimony, none of it has to do with nulls being fired by AGS. So what we're talking about here is a series of inferences and missing links, and they never quite presented to the district judge a theory for relevance, even by impeachment by contradiction to specific testimony that nulls gave on direct evidence. Did they ever say, we're trying to prove the meeting that nulls described just didn't even take place? Absolutely not. They all acknowledged it was that there was a meeting that they were attempting to offer a different view of the meeting, if you will. But never did, for instance, the counsel who was offering this testimony by Adriana Richards that there was this, that the issue of kickbacks came up at the meeting, never did counsel for Harris at trial say, and Your Honor, this will be relevant because of impeachment by contradiction to this testimony here that nulls gave on direct. It just was not presented well to the district court. It was not teed up well, and now they're trying to bring up all kinds of things on appeal in order to overturn the result of a six-week trial. The district judge searched hard. He thought about it all night. He couldn't see the relevance of it. The district judge was engaged on this issue. He gave them lots of chances to put out a coherent view of admissibility. Let's suppose that nulls was established to be less than honest. What effect would that have had? Your Honor, that would have been within the rule of 608B. That would have been impeachment of his credibility. I'm not asking about the rule now. What I'm asking about is the practical effect on the trial. Well, Your Honor, there would have been no practical effect on the trial, and I think that we have to make a harmlessness analysis part of Rule 52A and say there was a lot of other evidence. It also bears on the 403 as well as the 611. So I want to know as a practical matter, if the jury thought, well, that nulls was like a slippery fellow, what practical significance would it have had? I haven't read the transcript of the whole six-week trial because it's too long. So I really need your help knowing how it matters. If the jury thought that nulls was a slippery fellow, they would have been able to look at a lot of corroborating evidence. They would have been instructed that they can believe some or all or none of a witness's testimony, and they would have been urged and they were urged by the prosecution to treat nulls. I don't think you understand what I'm getting at. I know that they could choose to disbelieve nulls. I'm saying suppose they did. What is the practical effect? By that, what I mean is what would the jury – how important was nulls to getting the verdict? Nulls was an important witness, Your Honor, but nulls was heavily corroborated and so we would have, I believe, had a guilty verdict in any event. Was he testifying under some kind of a grant of immunity or a promise that he wouldn't be prosecuted or anything like that? No, Your Honor. However, he was not prosecuted and that fact was brought up as impeachment of nulls during cross-examination and that was open and acknowledged that he was not being prosecuted for his conduct. However, there was no plea agreement in his case. Was there other evidence adduced about nulls and whether he was taking kickbacks from third parties or the like? There was no evidence that was introduced at trial, Your Honor, about the kickback issue and that's because Judge Klausner believed it was so tangential. It had nothing to do with the elements of defense of the offense and because no theory of contradiction by impeachment by contradiction was properly teed up and submitted to him. I think the case is basically that these people set up bogus contractors and using their power in city government contracted with what amounted to themselves in order to shovel money out of the city treasury and into their personal treasuries and nulls is basically running one of the personal treasuries. Have I got that right so far? Correct, Your Honor. Actually, Defendant Harris was the president of AGS and Defendant Harris was signing the checks but, yes, nulls was involved in AGS, the front company. AGS is the phony company? AGS is the phony company, phony in the sense that it existed on paper and hid Paul Richards' true ownership of it and control of it and that's what nulls was running around acting at the direction of Paul Richards in order to ruin city contracts. Now, what I'm trying to find out is let's suppose nulls is just as crooked as everybody else in the view of the jury. What did you have without nulls saying it was a phony company, it was just running money from the city treasury into the defendant's pockets? Well, there was enormous evidence. There were many other witnesses who testified to the search evidence that the FBI brought up. The FBI went to Richards' home and dug up a lot of evidence showing that he was behind all these AGS deals. The government put on many other witnesses to testify that AGS was, in effect, an AGS that was acting at Paul Richards' control. The other evidence in the case was the perjury by the defendant Harris and defendant Thomas during the grand jury. Demonstrable evidence that there was conduit contributions or illegal campaign contributions taking place through AGS and through Thomas and Associates that Paul Richards was behind. We had a witness who was for the printing press company who distributed all defendant Richards' political mail in order to ensure that his political machine ran. And that witness testified that it was Paul Richards who came in and handled all these mailers and paying off his personal debts with AGS checks, with Thomas and Associates checks. So there was a lot of evidence in the case independent of Julio Nulls and a lot of corroboration of what Julio Nulls was saying. There was David Smith who was a billboard company representative who testified how Paul Richards and he had been in discussions for years about a billboard contract in Linwood. And all of a sudden, at the last possible moment, Richards says, I'm going to make sure there's a company that comes in to consult the city on this. Who does he bring in? He brings in AGS. AGS does absolutely nothing but is awarded the 20 percent interest in whatever monies are going to flow to the city of Linwood for this big billboard company, billboard contract that had been in the works for years. So there was a tremendous amount of evidence independent of Nulls. How about with respect to Harris that she knew that there were improprieties going on absent Nulls' testimony?  The billboard transaction involved in some of the other transactions that Harris the effect of which is that Harris is just a figurehead for AGS. She's not really doing anything. What did they say exactly? Well, for instance, we called a couple adverse or hostile witnesses involved in the billboard transaction who said that Harris had nothing to do with this. She had absolutely nothing to do with this contract. And at that point, she was AGS. Julio Nulls had left the company. And Harris had done nothing to advance this billboard transaction but stood to receive 20 percent of it. As Harris said in her grand jury testimony, she figured she'd get about a million dollars for doing absolutely nothing. Of course, Harris is connected by phone records, telephone records, and attorney billing records to conversations with Paul Richards during all of this. And the phone records and attorney billing records connect the conspirators together as working on this front company that was at the direction of Paul Richards in order to make all these transactions happen, to pour money into AGS and Thomson Associates so that those companies could act as slush funds. How did you prove that Harris wasn't just an innocent who'd been planted by her relative in a lucrative job where she didn't have to work hard but actually had no idea it was crooked, just that it was a really good deal? Well, there was plenty of evidence besides Nulls for that. And I was touching on it just now. But also, she is expending AGS funds to the benefit of Defendant Richards. She's the one with the checkbook. She's paying out these funds from her company to the benefit of Paul Richards and his home improvements, his political illegal campaign expenditures. Furthermore, she is participating in the collusive litigation with Paul Richards to try to force the city to comply with these corrupt contracts. Paula Harris is perjuring herself before the grand jury to protect herself and to protect Perjuring yourself in what respect? Well, Your Honor, there was a perjury count or a false declaration count in the indictment. She was found guilty of false declaration before grand jury. What did she claim that was untrue? Well, she claimed many things that were untrue. She particularly claimed that she had nothing to do I'm sorry, that Paul Richards had nothing to do with the campaign contributions that were made to pay off the political mailers for the Paul Richards political machine. I think she was convicted of perjury charged to be that she had not dealt with Paul Richards and the attorney for AGS. So she was trying to protect his connection with AGS. She was hiding. That was her whole part in this scheme was to hide Paul Richards' control over AGS. And when the jury found her guilty of perjury for telling the grand jury that she hadn't really been talking with Paul Richards at all ever about AGS, she was lying. She was convicted of perjury. And on top of being liable for perjury, it is consciousness of guilt. How did she explain AGS if she never talked to Richards and had nothing to do with anything and didn't know where the money was coming from and was just waiting for a bus? Well, she and the grand jury, she explained AGS as being Julia Knowles' idea that she was simply helping out with. Yeah. While we're on Harris, how do we figure out whether the restitution figure is correct? The $714,465 doesn't seem to come from any figure that I or any of the law courts could add up or subtract from. I mean, Linwood declared it was $1,096,000. PSR calculated $787,000. And you got numbers after numbers after numbers, and they come up with $714,465. Where did that come from? Well, Your Honor, I cannot give you an answer at the moment as to what the math was on that. I can tell you, though, that there were actual losses that were calculated in the PSR coming from the different contracts. Those were itemized. There were attorney's fees that were paid out in defense of the lawsuits. And, in fact, if I were to give you a very educated guess in response to your question, I would say that we took an attorney's fee from defense of the AGS lawsuit, which was, of course, part of the scheme, was that they would do this collusive litigation as part of the scheme to collect on the debts. And it's my belief that the figure of restitution added defense costs incurred by the city to defend against the AGS lawsuit that was collusive, and adding into that the amounts of actual loss calculated under the different contracts that were at issue. No, I can't add it up. Was there an objection to the amount of restitution at the sentencing hearing? I believe there were objections to the amount of restitution, but I don't believe that it was necessarily on that basis for Defendant Harris, and I may be wrong about that. It doesn't seem to have been explored, and the district court simply came up with that figure. Well, we're having a hard time figuring out how you justify that figure. Can I also, in talking about loss, can I please make clear why it's so important that we can rely upon those lawsuit damage claims? Because they were part of the scheme. It's not just that now, after conviction, we're reaching out and finding whatever we can to hit them with as heavy a sentence as we can. Paul Richards, the trial evidence showed, collusively wrote these contracts that AGS and Bevin Thomas's companies entered into with the city. That was a conflict of interest. They included these liquidated damages amounts in the Bevin Thomas contracts for the purpose of collecting those damages in the event that the tide turned in city council and they had to file a lawsuit. That's what they would seek. And they actually wrote such extravagantly unconscionable damage provisions for termination without cause that the city attorney for Lynwood made an objection to it in city council. So this is all part of the scheme going forward. And, of course, in the end, there's a change in power. Paul Richards is out of power. He is counseling the defendants to sue the city under these contracts that he's been involved in writing. And what do they do? They look to those very same liquidated damages provisions that they wrote. And, in fact, they've come very close to collecting most of that money. Under California law, you'd normally tell your clients that liquidated damages clauses generally aren't enforceable. And so if these have been legitimate contracts, you might put in a liquidated damages clause for settlement value, for settlement discussion. How do we know that the intent of Richards and his cohorts was to actually collect the full amount of the liquidated damages, which would be the restitution test? Well, the evidence was that they tried. And what they wound up with, just looking at the Bevin-Thomas lawsuits alone, was a settlement for $1.4 million after collusive discussions between Paul Richards and other members of the city council. So right there, they may not have, in the end, gotten a check, which was seized by the government in our case, before it could be cashed. But they came close, and they certainly tried and prayed for the damages that they had written into the contract collusively and as part of the corrupt scheme. So I think it's entirely appropriate for the court to look at those numbers and hold them against the defendants now. And I certainly also think that when we're talking about the $2.5 million threshold that was easily surpassed in this case, you have to say you could even take out one item here or one item there, for a given defendant, and still be well in excess of the $2.5 million threshold. I would also ask the court to consider the fact that the intended loss figure calculated in the PSR did not even include the past amounts paid under those contracts. If you look at the $6.2 million figure for intended loss in the PSRs, they just looked at the damage claims that were filed for future lost revenue by these front companies, and they did not even go back and add in the actual losses that had been paid out on all these suits, which they calculated to be roughly $600,000. So I think that in the end, the PSR underestimated the loss in this case, but clearly the district judge did not err when he found that it was in excess of $2.5 million. That is not an erroneous finding. And I would also say that the defense made all kinds of arguments at trial before sentencing as to why the PSR's number should not be adopted. I believe the court was very engaged at the sentencing issue and addressed a lot of those arguments. It certainly addressed the most important ones, and I do not believe that any procedural failure was committed by the district court. Counsel, in the few seconds you have left, do you have anything to say about the appearance of impropriety argument? Yes, Your Honor. The form that is a linchpin for the case in the Fair Political Practice Commission does not stand for the proposition that Shulman worked for Peddler and his company. It simply has never said that. That claim was thoroughly debunked. Just debunk it for us. I'm sorry? It's a gigantic record. I don't want to just have to take your word for it for what's in it. Just summarize for us how the claim was debunked. Well, first of all, the representation that the form said that Shulman worked for Peddler as a lobbyist was not true on the face of the document. So if you look at that one piece of paper, that this whole thing, this whole claim started with, the FPPC form, it does not stand for the proposition that they repeatedly say it stands for. And so in opposition to that, there were many, there were declarations filed explaining how there actually was no connection between Shulman and Peddler. There never was a representation there. Those declarations filed in opposition were never controverted. And there was no reason given to hold an evidentiary hearing. The government had thoroughly debunked the claim and they had nothing left to go on. There was no reason proffered to the judge to hold an evidentiary hearing because the claim had been so thoroughly debunked. Thank you. I have one question for somebody who represents Harris on restitution. Shall we move into rebuttal? Thank you, Your Honor. Do you represent Harris? Yes, I represent Harris. Is the restitution issue then yours? Well, actually, Mr. Harris was dealing with restitution issues. I do represent, so I'm not familiar with the restitution issues. I did want to address, we had reserved, I think, three minutes of time, or we had tried to reserve three minutes of time,  the amount of loss issue with respect to Harris. The amount of loss issue is the amount of loss if I may. I'm not interested in restitution, but go ahead and do whatever you'd like. Okay. With respect to Mr. Harris, I think there's no doubt that the amount of loss was overstated and that the amount of loss was at least less than $2.5 million. And there were two issues in which there were It's intended loss, right? Intended loss, yes. I'm sorry, Your Honor. One is that about $2.6 million had to do with a waste management contract with which Harris and AGS had absolutely no involvement. And the rule is that the scope of criminal activity jointly undertaken by the defendant is not necessarily the scope of the entire conspiracy. And relevant conduct is not necessarily the same for every participant. The judge has to examine what each specific defendant specifically agreed to do. And therefore, Harris didn't even know about the waste management contract. She can't be held liable for that. And the Court just imposed the same amount of loss on all the defendants without inquiring what each defendant agreed to do. So the $2.6 cannot be attributed to Ms. Harris. The second thing is with respect to the $2 million claimed under the billboard contract, that was not an intended loss. The lawsuit says when we perform under the billboard contract we're going to generate $10 million in revenue for Linwood. Of that, we will take our 20 percent commission. So the $2 million was only a 20 percent commission on $10 million that Linwood was going to receive. It was not an intended loss. It was an intended gain to Linwood. And that's why I wanted to specifically with respect to the amount of loss in Harris, there's no doubt that it was at least less than 2.5 million. You're Catherine Young, right? I am, sorry. And you wrote the brief for Paula Harris? That's right. I'm trying to get at this restitution issue. Oh, I'm sorry. One of the issues you say is Harris objected to the amount of restitution. She argued the actual loss amount was 415 and changed, and she should not be liable for legal fees incurred by TNA or JNA. Thus, the total amount she owed was 425,766.76. Take a look at her sentencing position, page 16. The district court imposed a restitution of 714,465. And you want that's an issue. You want us to reverse the restitution? Yes, I'm sorry, Your Honor. Because she got less than you said she owed. That's what I don't understand. You said she owed 425 and the restitution was oh, I see 714. I got you. What's the problem? Sorry, go ahead. What's the problem with the restitution? You know, I apologize, Your Honor. I didn't read up. I didn't prepare for that issue. Okay. I apologize. All right. And I wanted to touch just briefly on Harris's You have exhausted your time. Okay. Thank you, Your Honor. Thank you, counsel. Was there rebuttal time left? Thank you. Unless my colleagues have further questions, United States v. Harris is submitted. We're adjourned until 930 a.m. tomorrow.
judges: Trott, Kleinfeld, Ikuta